## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ELAINE HOPE, INDIVIDUALLY** | ) | **CASE NO.   1:05 CV 538** |
| **AND AS ADMINISTRATOR FOR** | ) | |
| **THE ESTATE OF TIMOTY A.** | ) | |
| **KILIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAKE COUNTY BOARD OF** | ) | **MEMORANDUM OPINION** |
| **COMMISSIONERS, et al.** | ) | **AND ORDER** |
| | ) | |
| **Defendants.** | ) | |

This matter is before the Court upon Defendants' Motion for Summary Judgment. (Dkt. #28).

## I.  FACTUAL HISTORY

Plaintiff, Elaine Hope ("Hope"), is the appointed Administrator for the Estate of Timothy A. Kilian ("Kilian").  (Dkt. #1, Ex. 1, Complaint ¶ 1).  Kilian was an inmate at the Lake County Jail from January 18, 2003 until his death on January 20, 2003.  (Complaint ¶ 5).

Kilian was arrested for a probation violation on Saturday, January 18, 2003 and was

placed in the Lake County Jail.  That Saturday afternoon, at approximately 3:00 p.m. Kilian

spoke with Corrections Officer Elisa Smith ("CO Smith").  (Dkt. #28, Declaration of Elisa

Smith ("Smith Decl.") ¶ 5).  CO Smith knew Kilian[1] and carried a conversation with him.

During the visit and conversation CO Smith noted that Kilian was coherent, and she saw

no indication that Kilian was depressed or suicidal.  (Smith Decl. ¶¶ 5–6).  At around 1:00

a.m. Sunday morning, Corrections Officer Denise Collins ("CO Collins") reported to

Sargent Michele Prather (Sgt. Prather") that Kilian was having trouble breathing and that

he needed an inhaler.  (Dkt. #28, Ex. A to Declaration of Michele Prather ("Prather V.S.")).

Upon the advice of the Jail's physician, Dr. Baster, Sgt. Prather directed CO Collins to give

Kilian an inhaler.  (Id.).

        Later that evening, Corrections Officer, Lib Vitale ("CO Vitale") worked second

shift and was assigned as the Dispensary Officer.  (Dkt. #28, Ex. A to Declaration of Lib

Vitale ("Vitale V.S.")).  During the first half hour of his shift, CO Vitale was informed that

Kilian was having difficulty being around people, was upset and was hyperventilating.

(Id.).  CO Vitale and another corrections officer moved Kilian to an isolation cell in an

attempt to calm him.  (Id.).  CO Vitale also, around 9:00 p.m., telephoned Nurse Anne

Takacs ("Nurse Takacs") at home and informed her that Kilian was crying and

hyperventilating and that his inhaler was not working.  (Id.; Dkt. #28, Ex. A to Declaration

of Anne Takacs ("Takacs V.S.")).  Nurse Takacs instructed CO Vitale to give Kilian a

---

        [1]Plaintiff Hope, the mother of Kilian, is also the mother of CO Smith's niece, Tiffany
Smith.  Because of this family connection, CO Smith knew Kilian prior January 2003.
(Smith Decl. ¶ 3).

paper bag to breath into, to keep an eye on Kilian, and to let her know if there were any troubles.  (Id.).  Consequently, at approximately 9:26 p.m. Kilian was placed on a ten-minute welfare check.  (Dkt. #28, Declaration of Russell Tuttle ("Tuttle Decl.") ¶ 3).  This welfare check was not designated as a suicide watch.  (Id.).

CO Vitale gave Kilian a paper bag, as instructed by Nurse Takacs.  (Vitale V.S.). CO Vitale also retrieved Kilian's inhaler from his cell and noticed the inhaler was badly damaged and empty.  (Id.).  A while later, Kilian remained upset, so the corrections officers moved him from isolation to Male Holding #1, and then from Male Holding #1 to Male Holding #4 in Booking ("MH4"), whereupon he was given another bag to use in MH4. (Takacs V.S.; Vitale V.S.).

On Monday morning, January 20, Nurse Takacs arrived at 8:00 a.m. and was informed that Kilian had been moved to MH4 and that Kilian needed a new inhaler. (Takacs V.S.).  Nurse Takacs placed Kilian on sick call for examination by Dr. Baster. (Id.). Dr. Baster arrived and began sick call at around 9:30 a.m.  (Id.).  Dr. Baster examined Kilian and asked Nurse Takacs to get Kilian another inhaler.  (Id.).  Nurse Takacs did not give Kilian the inhaler to keep; instead Dr. Baster had Kilian take two puffs and wait for several minutes, whereupon Dr. Baster re-examined Kilian to see if his lungs were clear. (Id.).  Dr. Baster informed Nurse Takacs that Kilian's inhaler would be kept on the dispensary cart so Kilian could use it when needed and that Killian would not be allowed to keep the inhaler in his cell because he had abused his other inhaler.  (Takacs V.S.).  Dr. Baster referred Kilian to be seen by Mental Health because of his anxiety that she felt was

3

causing him to hyperventilate.  (Id.).  At no time during the examination did Kilian show any signs of depression or indicate that he was contemplating suicide, nor did his medical history include any treatment for depression or any other mental health problem.  (Id.).

Monday afternoon, CO Vitale again worked second shift and again was Dispensary Officer.  CO Vitale checked on Kilian earlier in the shift and had an inhaler for him if he needed it, but kept it on the cart.  (Vitale V.S.).  Kilian told CO Vitale he did not need the inhaler.  (Id.).

Individual Defendants Corrections Officer Thomas Wetmore ("Wetmore"), Corrections Officer Michael Cayen ("Cayen"), and Lt. Russell Tuttle ("Tuttle") also worked second shift on Monday, January 20.  (Dkt. #28, Ex. A to Declaration of Michael H. Cayen ("Cayen V.S."); Ex. A to Declaration of Thomas Wetmore ("Wetmore V.S."); Ex. A to Declaration of Russell Tuttle ("Tuttle V.S.")).  Wetmore was assigned to Booking.  (Wetmore V.S.).  At 3:05 p.m. Wetmore conducted the initial welfare checks of all the cells in Booking.  (Id.).  He continued to conduct welfare checks every ten minutes, including checks on Kilian.  (Id.).  At this time, Tuttle was also present in Booking.  (Tuttle V.S.).  Tuttle observed Wetmore as well as Correctional Officer Kline ("CO Kline") perform welfare checks on a regular basis.  (Id.).  Tuttle also spoke with Kilian.  (Id.).  When Kilian informed Tuttle that he had been hyperventilating, Tuttle told Kilian to relax and assured Kilian he would inform the nurse.  (Id.).  After visiting with Kilian, Tuttle remained in Booking, observing the officers working there.  (Id.).

At approximately 4:30 p.m., Wetmore fed the inmates in Booking.  (Tuttle V.S.;

4

Wetmore V.S.). At 4:50 p.m. Wetmore noticed Kilian had not eaten from the tray on his door. (Id.). When asked, Kilian told Wetmore he did not want to eat, and Wetmore removed the tray. (Id.). Wetmore conducted a welfare check at 5:03 p.m. (Id.). Wetmore then helped with the processing of a female inmate. (Wetmore V.S.). During the next welfare check, around 5:10 or 5:12 p.m., Wetmore discovered Kilian had hanged himself. (Id.; Tuttle V.S.).

Wetmore notified fellow staff and correctional officers, who came to his aid. (Wetmore V.S.; Tuttle V.S.). Together, they cut Kilian down and pulled him out of the cell. (Id.). The nurse, who happened to be nearby, began rescue breathing; another correctional officer commenced chest compressions. (Wetmore V.S.; Vitale V.S.; Cayen V.S.). Someone also notified Painesville Rescue, who eventually arrived and also attempted to resuscitate Kilian before taking him to the hospital. (Tuttle V.S.; Wetmore V.S.).

Meanwhile, both CO Vitale and Defendant Cayen were on break and located at the loading dock. (Cayen V.S.; Vitale V.S.). At 5:10 p.m., a correctional officer radioed CO Vitale asking him to bring the medical bag from the Dispensary to Booking. (Vitale V.S.). Cayen overheard the radio call and followed CO Vitale to Booking. (Cayen V.S.). Once in Booking, Cayen overheard Wetmore saying he had been doing welfare checks every ten minutes. (Cayen V.S.). Tuttle pointed towards the direction of the welfare check log and told the officers working in Booking to make sure their logs were up to date. (Id.). Cayen picked up the welfare check log and determined it was only filled out to 4:00 p.m. (Id.). Cayen filled out three welfare checks; on Kilian's welfare check, he filled out the time 4:10

5

p.m. to 5:20 p.m. and wrote in when Painesville Rescue arrived and when CPR was performed.  (Id.).

Kilian was transported to a local hospital where life saving efforts continued until he was pronounced dead.  (Tuttle V.S.).

On January 12, 2005 Plaintiff filed a Complaint in the Lake County County Court of Common Pleas, naming as defendants the Lake County Board of Commissioners ("Lake County"), Lake County Jail (the "Jail"), Lake County Sheriff's Department ("Sheriff's Department"), Wetmore, Cayen, and Tuttle.[2]  The Complaint asserts claims under Ohio law for wrongful death and falsification of records[3] and a claim pursuant to 42 U.S.C. § 1983 for violation of Kilian's Fourth, Eighth and Fourteenth Amendment constitutional rights.[4]

On February 9, 2005, Defendants removed the action to this Court.  (Dkt. #1).  On August 28, 2005, Defendants moved for judgment on the pleadings as to claims alleged against the Sheriff's Department, the Jail, Cayen, Tuttle, and Lake County.  (Dkt. #17).  Defendants, subsequently, filed the instant motion for summary judgment which incorporates, by reference, all of the arguments asserted in Defendants' motion for

---

[2]The Complaint also names John Does 1 through 5.  No service, however, has been perfected against these defendants, nor have they been identified.  Accordingly, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, John Does 1 through 5 are **DISMISSED** as defendants.

[3]Plaintiff asserts that the Complaint contains a civil tort claim for spoliation with respect to Cayen and Tuttle.  (Dkt. #20).  Defendants dispute that the Complaint sufficiently alleges a claim of spoliation.  (Dkt. #17).

[4]Plaintiff has abandoned the Sixth Amendment claim asserted in Paragraph 21 of the Complaint.  (Dkt. #28, Plaintiff's Discovery Responses at answer to Interrogatory No. 10).

6

judgment on the pleadings.  (Dkt. #28 at 7).

## II. STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56 (c).  "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering such a motion, the court must review all of the evidence in the record. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56 (c)).  The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25).  The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250).  "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## III.  LAW AND ANALYSIS

### A.  Defendants Lake County Jail and Lake County Sheriff's Department

Although the Complaint asserts claims against the Jail and Sheriff's Department, the Jail and Sheriff's Department are not entities subject to suit.  It is well established that a sheriff's department is not a proper legal entity, and, therefore is not subject to suit.  See Rhodes v. McDannel, 945 F.2d 117, 120 (6th Cir. 1991).  Moreover, pursuant to the Federal Rules of Civil Procedure, the capacity to sue or be sued is determined by the law of the state

8

in which the district court sits or by the law of the individual's domicile, see FED. R. CIV. PRO. 17(b), and "[u]nder Ohio law, a county sheriff's office is not a legal entity that is capable of being sued."  Barrett v. Wallace, 107 F.Supp.2d 949, 954 (S.D.Ohio 2000) (citing Batchik v. Summit County Sheriff's Dep't, No. 13783, 1989 WL 26084 (Ohio Ct.App. Mar. 15, 1989)).  Likewise, the Lake County Jail is not a legal entity amenable to suit.  The Lake County Jail "is merely a name assigned to the building which houses inmates.  [It] is not a municipality, but rather, a building in the county and, as such, is not a separate legal entity which can be sued." Fuller v. Cocran, No. 1:05-CV-76, 2005 WL 1802415 (E.D. Tenn. July 27, 2005); see also Seals v. Grainger County Jail, No. 3:04-CV-606, 2005 WL 1076326 (E.D. Tenn. May 6, 2005) ("The Grainger County Jail, however, is not a suable entity within the meaning of § 1983.").

Accordingly, the Lake County Sheriff's Department and Lake County Jail are not subject to suit or liability under any claims alleged in the Complaint, and the Lake County Sheriff's Department and Lake County Jail are dismissed from this action.

## B. Federal Claims

Pursuant to 42 U.S.C. § 1983, Plaintiff's Complaint asserts claims against all Defendants for violations of Plaintiff and Plaintiff's decedent Kilian's constitutional rights.

## 1. Individual Defendants — Qualified Immunity

Plaintiffs have asserted Section 1983 claims against defendants Wetmore, Cayen and Tuttle in their individual capacities, and in their Answer, these individual defendants raise

9

the defense of qualified immunity.[5]  (Dkt. #5 ¶ 20).  Title 42 U.S.C. § 1983 provides a cause

of action against any person, who, under color of state law, deprives an individual of any

right, privilege, or immunity secured by the Constitution and federal law.  See 42 U.S.C.

§ 1983.  When officials are sued in their individual capacities, they may be protected from

liability for damages if their alleged wrongful conduct was committed while they performed

a function protected by qualified immunity.  See Cagle v. Gilley, 957 F.2d 1347, 1348 (6th

Cir. 1992).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of

litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526.  The privilege is an "immunity from suit

rather than a mere defense to liability; and like an absolute immunity, it is effectively lost

if a case is erroneously permitted to go to trial."  Id.  Qualified immunity protects "all but

the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475

U.S. 335, 341.  Government officials are entitled to qualified immunity when performing

discretionary functions as long as the conduct "does not violate clearly established statutory

---

[5]The Court notes that this case was originally assigned to the Honorable Judge Paul R. Matia.  (Dkt. #1).  Upon retirement of Chief Judge Matia, the case was reassigned to this Court's docket, (Dkt. #12), at which time the parties were in discovery pursuant to the Case Management Conference Plan issued by Chief Judge Matia, (Dkt. #8).  The record lacks any indication as to whether the parties raised qualified immunity at the initial case management conference.  Qualified immunity questions must be resolved at the earliest possible stage in litigation, Saucier v. Katz, 533 U.S. 194 (2001), and it is the practice of this Court to stay discovery pending a ruling on the issue of qualified immunity.  See Anderson v. Creighton, 483 U.S. 635, 646 (1987).  As the Court was unable to address the issue of qualified immunity before the parties began conducting discovery, the Court will now address the fully briefed issue of qualified immunity.

or constitutional rights of which a reasonable person would have known." <u>Harlow v.</u>
<u>Fitzgerald</u>, 457 U.S. 800, 818 (1982). Whether a party is entitled to qualified immunity is
typically a question of law for the court to decide. <u>Brandenburg v. Cureton</u>, 882 F.2d 211,
215 (6th Cir.1989). When the facts on which the question of immunity turns are in dispute,
however, it is for the trier of fact to make the factual findings underlying resolution of the
qualified immunity issue. <u>Gardenhire v. Schubert</u>, 205 F.3d 303, 311 (6th Cir.2000).

In order to prevail in a Section 1983 action against a government official, a plaintiff
must overcome qualified immunity by establishing that the official violated a "clearly
established" constitutional right and "[t]he contours of the right must be sufficiently clear
that a reasonable official would understand that what he is doing violates that right."
<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). Consequently, a plaintiff opposing
qualified immunity must answer this threshold question: whether the facts, taken in the light
most favorable to the plaintiff, demonstrate that an official's conduct violated a
constitutional right. <u>See</u> <u>Saucier</u>, 533 U.S. at 198; <u>Crockett v. Cumberland Coll.</u>, 316 F.3d
571, 579 (6th Cir. 2003). If no constitutional right would have been violated were the
allegations established, the Court must terminate the qualified immunity inquiry and
dismiss the suit. <u>See</u> <u>Saucier</u>, 533 U.S. at 198. On the other hand, if the plaintiff answers
the question in the affirmative, "the next, sequential step is to determine whether the right
was clearly established." <u>Id</u>. With regard to this second step, the plaintiff must rely on
either Supreme Court precedent, precedent from this Court, or cases from other courts
which "point unmistakably to the unconstitutionality of the conduct and [are] so clearly

foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." Mumford v. Zieba, 4 F.3d 429, 432-33 (6th Cir.1993).  If the plaintiff fails to establish either the existence of a constitutional violation or that such a violation was clearly established, the Court must dismiss the action.

Accordingly, the Court shall first determine whether Plaintiff has presented sufficient facts to demonstrate that the individual defendants' conduct violated Plaintiff or Kilian's constitutional rights.

**a. Defendant Wetmore**

Plaintiff contends that Wetmore violated Kilian's Eighth and Fourteenth Amendment rights under the Constitution by failing to sufficiently monitor Kilian's health.[6] Specifically, Plaintiff alleges Wetmore failed to perform ten minute welfare checks on Kilian.  (Complaint ¶ 7).

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs.  Pretrial detainees are analogously protected under the Due Process Clause of the Fourteenth Amendment." Blackmore v. Kalamazoo County, 390 F.3d 890,

---

[6]Plaintiff fails to clarify the nature of the Fourth Amendment violation asserted in the Complaint.  (Complaint ¶ 21).  The facts as well as the arguments before the Court  fail to demonstrate or even allege a violation of Plaintiff or Kilian's Fourth Amendment rights. Consequently, the Court finds no violation by any defendant of Plaintiff or Kilian's  Fourth Amendment rights under the Constitution.

895 (6th Cir. 2004) (internal citations omitted).  Whether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983.  See id. (citing Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir. 1985).  Thus, "[i]n order to sustain a [Section] 1983 claim against individuals for failure to provide adequate medical care, a plaintiff must show that defendants acted with 'deliberate indifference to serious medical needs.'"  Gray v. City of Detroit, 399, F.3d 612, 616 (6th Cir. 2005) (quoting Watkins v. City of Battle Creek, 273 F.3d 682, 686 (6th Cir. 2001)); see Estelle v. Gamble, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'…proscribed by the Eighth Amendment.  This is true [even when] the indifference is manifested…by prison guards in intentionally denying or delaying access to medical care….").

Deliberate indifference encompasses both an objective and a subjective component; accordingly, a constitutional claim for denial of medical care has objective and subjective components.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994); Napier v. Madison County, 238 F.3d 739, 742 (6th Cir. 2001); Brown v. Bargery, 207 F.3d 863, 867 (6th Cir. 2000).  The objective component requires the existence of a "sufficiently serious" medical need.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 104.  "As the Supreme Court explained in Farmer, 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.' "  Brown, 207 F.3d at 867 (quoting Farmer, 511 U.S. at 834).

The subjective component requires an inmate to demonstrate that prison officials

13

have "a sufficiently culpable state of mind in denying medical care." Brown, 207 F.3d at 867 (citing Farmer, 511 U.S. at 834).  A "sufficiently culpable state of mind" is one in which "the official knows of and disregards an excessive risk to [a detainee's] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see also LeMarbe v. Wisneski, 266 F.3d 429, 435 (6th Cir. 2001).   An official can be liable if he "disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 848.  "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Horn v. Madison County Fiscal Court, 22 F.3d 653, 660 (6th Cir.1994).

Plaintiff asserts Wetmore was deliberately indifferent to Kilian's psychological needs, specifically, his risk for suicide.   It is well established that a prisoner's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001) (citing Horn v. Madison Cty. Fiscal Ct., 22 F.3d 653, 660 (6th Cir. 1994)).  Plaintiff, however, fails to demonstrate the subjective component of Plaintiff's claim—that Wetmore knew of and disregarded an excessive risk to Kilian's health or safety.  See Farmer, 511 U.S. at 837. The evidence before the Court demonstrates that Kilian was on a medical watch, not a

14

suicide watch, and that Wetmore conduced welfare checks on Kilian every ten minutes.[7]

There is no general constitutional right of detainees to receive suicide screenings or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide.  See Gray, 399 F.3d at 616; Barber, 953 F.2d at 240; Danese v. Asman, 875 F.2d 1239, 1244 (6th Cir. 1989); see also Crocker v. County of Macomb, No. 03-2423, 119 Fed.Appx. 718, 724 (6th Cir. Jan. 4, 2005) (unpublished) (finding no change in the law since Danese was decided in 1989).  The Constitution does,

---

[7]Plaintiff disputes that Wetmore conducted the welfare checks every ten minutes. Plaintiff, however, in asserting purported facts in opposition to this fact and in opposition to Defendants' entire motion for summary judgment relies upon unauthenticated documents.  (Dkt. #38, Exs. 1, 2; Dkt. #41).  Rule 56(e) specifies the requirements governing documents in summary-judgment proceedings.

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith….

FED. R. CIV. PRO. 56(e).  Uncertified copies of documents attached as exhibits to a brief regarding a motion for summary judgment do not comport with the requirements of 56(e). See Carter v. Western Reserve Psychiatric Habilitation Center, 767 F.2d 270, 273 n. 2 (6th Cir. 1985).  And "documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded."  Moore v. Holbrook, 2 F.3d 697, 699 (6th Cir. 1993); see Logan v. Denny's, Inc., 259 F.3d 558, 570 (6th Cir. 2001).  The Lake County Sheriff's Documents, (Dkt. #40) are neither sworn nor certified, and the affidavit attached to Plaintiff's opposition brief, (Dkt. #37, Ex. 2), is neither signed nor notarized.  These materials are not properly before the Court, and the factual assertions and arguments based upon them cannot be considered.  Furthermore, even if the Court were able to consider the documents, a review of the unauthenticated welfare check log reveals Wetmore did, indeed, perform welfare checks on Kilian within ten minute intervals.

15

however, oblige prison officials, who have been alerted to a prisoner's serious medical needs, to offer medical care to such a prisoner.  Comstock v. McCrary, 273 F.3d 693, 702.

> "[T]he proper inquiry concerning the liability of a City and its employees in both their official and individual capacities under Section 1983 for a jail detainee's suicide is: whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs."

Gray, 399 F.3d at 616 (citing Barber v. City of Salem, 953 F.2d 232, 239–40 (6th Cir. 1992)).

The evidence does not show that any individual defendant, let alone Wetmore, had information indicating that Kilian was a suicide risk.  During the hours before his death, Kilian complained of anxiety and experienced hyperventilating attacks and bouts of crying. None of this behavior, however, was self-injurious, and Kilian's medical history contained no indications of depression, suicidal tendencies or other mental health problem.  See Gray, 399 F.3d at 616 (finding officials had no knowledge plaintiff was a suicide risk where plaintiff's complaints had been of a physical nature and none of plaintiff's behavior had been self-injurious); Cf. Schultz v. Sillman, No. 04-1507, 148 Fed. Appx. 396, 402 (6th Cir. Aug 10, 2005) (finding knowledge by an official of a decedent's crying behavior coupled with knowledge of decedent's previous suicide attempts demonstrated knowledge by the official of an excessive risk to the decedent).  Kilian, therefore, did not demonstrate a "strong likelihood" of committing suicide, and Wetmore neither knew Kilian was contemplating suicide nor knew of circumstances clearly indicating Kilian was a suicide

16

risk. Such knowledge "is essential to a finding of deliberate indifference." <u>Horn</u>, 22 F.3d at 660. Accordingly, Wetmore did not possess a sufficiently culpable state of mind because he knew of no suicide risk to Kilian and was, consequently, incapable of disregarding such a risk.[8]

Consequently, no facts before the Court demonstrate Wetmore violated Kilian's constitutional right to medical care under the Eighth and Fourteenth Amendments. The first prong of the qualified immunity analysis has not been met with respect to Wetmore. <u>See Saucier</u>, 533 U.S. at 198. Therefore, Wetmore is entitled to qualified immunity and is granted summary judgment on Plaintiff's Section 1983 claim.

**b. Defendants Cayen and Tuttle**

Plaintiff does not assert that Cayen or Tuttle violated Kilian's constitutional right to medical care under the Eighth and Fourteenth Amendments.[9] Instead, Plaintiff contends that the constitutional violation committed by Cayen and Tuttle was denial of Plaintiff Hope's access to the courts. Plaintiff alleges that Tuttle ordered and Cayen completed the falsification of the welfare check log in an attempt to conceal violations of Kilian's

---

[8]The Court further notes that the welfare checks performed by Wetmore complied with the Ohio administrative requirements for attending to a suicidal prisoner. <u>See</u> OHIO ADMIN. CODE 5120:1-8-09(P)(4) ("A suicidal prisoner is checked at varied intervals not to exceed ten minutes.").

[9]The Complaint fails to allege actions by Cayen or Tuttle causally connected to a violation of Kilian's Eighth and Fourteenth Amendment rights, and the record before the Court fails to demonstrate evidence of conduct by either Cayen or Tuttle causally connected to a violation of Kilian's Eight and Fourteenth Amendment constitutional rights.

constitutional rights and thereby impeded Plaintiff's ability to seek redress for those constitutional violations.  (Complaint ¶¶ 8–9; Dkt. #20 at 7).  Plaintiff argues that by falsifying the welfare check log,  Cayen and Tuttle each violated Plaintiff's right of access to the courts.

"[T]he right of access to the courts is a fundamental right protected by the Constitution."  Graham v. National Collegiate Athletic Ass'n, 804 F.2d 953, 959 (6th Cir. 1986); see generally Swekel v. City of River Rouge, 119 F.3d 1259 (6th Cir. 1997) (discussing the right of access to the courts and finding support for such a right in several provisions of the Constitution including: the Due Process Clause of the Fourteenth Amendment, see Wolff v. McDonnell, 418 U.S. 539, 579 (1974), the Equal Protection Clause, see Pennsylvania v. Finley, 481 U.S. 551, 557 (1987), the First Amendment, see Turner v. Safley, 482 U.S. 78, 84 (1987), and the Privileges and Immunities Clause of Article IV, see, e.g., Chambers v. Baltimore & Ohio R.R. Co., 207 U.S. 142, 148 (1907); Smith v. Maschner, 899 F.2d 940, 947 (10th Cir.1990)).  The Constitution insures that access to courts must be "adequate, effective and meaningful."  Bounds v. Smith, 430 U.S. 817, 822 (1977). Thus, as part of the qualified immunity analysis, the Court must determine if Plaintiff has presented sufficient facts to demonstrate that Cayen and Tuttle's conduct violated Plaintiff's right of access to the courts.  See Saucier, 533 U.S. at 198.

In order to state a claim for denial of meaningful access to the courts, a plaintiff must present evidence that a defendant's actions actually rendered a legal remedy ineffective.  See Boone v. Spruggess, 385 F.3d 923, 931 (6th Cir. 2004) (quoting Swekel,

18

119 F.3d at 1260–61) (internal quotations omitted).  "'[I]f a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts.'"  Id.  Where a plaintiff fails to demonstrate how a defendant's actions effectively denied plaintiff a legal remedy, no constitutional violation exists.  See e.g., Boone, 385 F.3d at 931; Swekel, 119 F.3d at 1260–61.  For example, the plaintiff in Boone complained that the defendants conspired to defeat the plaintiff's assault claim.  See Boone, 385 F.3d at 931–32.  The court, however, found that the plaintiff failed to show an effective denial of access to the courts because the plaintiff knew the identity of his assailant and the defendants did not conceal any evidence or otherwise retard the plaintiff's efforts to accumulate proof of his claim.  Id.  In Swekel, the plaintiff failed to show an effective denial of access to the courts because she never even attempted to seek redress in state court and, therefore, could present no evidence that the defendants' actions actually impeded her access to the state court.  Swekel, 119 F.3d at 1260–61.

Likewise, in the instant case, Plaintiff fails to demonstrate how Cayen or Tuttle's actions effectively denied Plaintiff a legal remedy.  First, Plaintiff engages in a novel application of the right of meaningful access to the courts.  An examination of case law reveals that the right traditionally is invoked in cases alleging a denial of a state court remedy.  See Boone, 385 F.3d at 931; Swekel, 119 F.3d at 1260–6; Ryland v. Shapiro, 708 F.2d 967 (5th Cir.1983).  Second, and more importantly, Plaintiff presents no evidence that Cayen and or Tuttle's actions impeded Plaintiff's access to a legal remedy.  Tuttle never

19

instructed Cayen to falsify or even to fill out the welfare check log.  Cayen, acting on his own initiative, completed the welfare check log for Wetmore with time entries corresponding to the welfare checks Wetmore had completed.  There is no evidence that Cayen or Tuttle falsified records.  Nor is there evidence that Cayen or Tuttle withheld records or other information from Plaintiff.

Consequently, no facts before the Court demonstrate Cayen or Tuttle violated Plaintiff's constitutional right of access to the courts.  The first prong of the qualified immunity analysis has not been met with respect to defendants Cayen and Tuttle.  See Saucier, 533 U.S. at 198.  Therefore, Cayen and Tuttle are entitled to qualified immunity and are granted summary judgment on Plaintiff's Section 1983 claim.

## 2. Defendant Lake County — Municipal Liability

Plaintiff also asserts a Section 1983 claim against Lake County.[10]  Initially, the Court notes that, absent a constitutional violation, there can be no municipal liability.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (for municipal liability to exist, a constitutional violation must take place); Ewolski v. City of Brunswick, 287 F.3d 492, 516 (6th Cir. 2002); Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir.2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.").  Plaintiff has failed to establish a

---

[10] In so far as the Complaint asserts Section 1983 claims against Wetmore, Cayen and Tuttle in their official capacities, such claims are treated as being an action against Lake County.  See Hafer v. Melo, 502 U.S. 21, 25 (1991); Barber v. City of Salem, 953 F.2d 232, 237 (6th Cir. 1992)..

20

constitutional violation on the part of individual defendants Wetmore, Cayen and Tuttle. Therefore, Defendants are entitled to summary judgment with respect to Plaintiff's municipal liability claim.

Nevertheless, even if Plaintiff had established a constitutional violation on behalf of Wetmore, Cayen or Tuttle, the Court concludes that Defendants are entitled to summary judgment with respect to the municipal liability claims.  Although a local government such as Lake County qualifies as a "person" with respect to Section 1983 liability, it cannot be held liable under Section 1983 on a respondeat superior theory.  See Monell v. Department of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978); Gregory v. Shelby County, 220 F.3d 433, 441 (6th Cir.2000).  Rather, municipal liability attaches only when a county policy or custom caused the injury or was the moving force behind the constitutional violation.  See Monell, 436 U.S. at 694; Gregory, 220 F.3d at 441; City of Canton v. Harris, 489 U.S. 378, 385 (1989).  To establish a basis for municipal liability, a plaintiff must demonstrate

> (1) that the City pursued an official custom or policy of failing to adequately train, supervise, or discipline its officers in a particular matter, and (2) that such official policy or custom was adopted by the official makers of policy with "deliberate indifference" towards the constitutional rights of persons affected by the policy or custom.

Haverstick v. Financial Fed. Credit, Inc., 32 F.3d 989, 996 n. 8 (6th Cir. 1994) (citing City of Canton, 489 U.S. at 387–88); see Board of County Comm'rs fo Bryan County v. Brown, 520 U.S. 397, 404 (1997).  Plaintiff fails to connect an identified custom or policy to Lake County, or show that a particular injury was incurred because of the execution of that

21

custom or policy.  See id.  In short, Plaintiff fails to even allege that the violation of Kilian's rights resulted from any policy or custom on the part of Lake County.

Plaintiff argues that Lake County may be held liable under Section 1983 for a failure to adequately train for suicide prevention.  (Dkt. #37 at 15).  Inadequate training of officers, however, may serve as a basis for liability under Section 1983 only where the failure to train amounts to deliberate indifference to the rights of individuals with whom the officers come into contact.  See City of Canton, 489 U.S. at 388.  Plaintiff fails to provide evidence demonstrating deliberate indifference by any Lake County employee to Plaintiff or Kilian's constitutional rights.  Indeed, Plaintiff has failed to demonstrate a constitutional violation by any individually named officer.  A court need not examine whether a municipal defendant provided its jail officers with adequate training when the a plaintiff fails to present sufficient evidence of an underlying constitutional tort.  See Crocker ex rel Estate of Tarzwell v. City of Macomb, No. 03-2423,119 Fed.Appx. 718, 724 (6th Cir. Jan. 4, 2005) ("If the plaintiff fails to establish a constitutional violation by an individual officer, the local government unit cannot be held liable for a failure to train under § 1983."); Watkins, 273 F.3d at 687 (holding that analysis of whether the municipal defendant failed to provide its jail officers with adequate training is unnecessary when the plaintiff-detainee fails to establish that the officers committed a constitutional violation); Napier, 238 F.3d at 743 (declining to consider whether the municipal defendant failed to provide adequate training to its jail officers because plaintiff-detainee "cannot show that he suffered an underlying constitutional violation").

Consequently, Lake County cannot be held liable under Section 1983 for a failure to train and Defendants are entitled to summary judgment with respect to the municipal liability claim.

## C.  State Law Claims

The remaining claims Complaint assert violations of Ohio law.  As the Court has dismissed the all federal claims alleged against Defendants, the Court, in its discretion, declines to exercise supplemental jurisdiction over the remaining state law claims asserted in the Complaint.  See 28 U.S.C. § 1367(c)(3); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); Taylor v. First of America Bank-Wayne, 973 F.2d 1284, 1287 (6th Cir. 1992).  Accordingly, Plaintiffs remaining state law claims are **DISMISSED** without prejudice.

## IV.  CONCLUSION

For the foregoing reasons, individual defendants Wetmore, Cayen and Tuttle are entitled to qualified immunity and summary judgment on the Section 1983 claims.  In addition, municipal defendant Lake Court is also entitled to summary judgment on the Section 1983 claims.  The Court declines to exercise jurisdiction over the remaining state law claims.  Accordingly, Defendants' Motion for Summary Judgment (Dkt. #28) is **GRANTED** and Plaintiff's claims are **DISMISSED**.

**IT IS SO ORDERED.**

 */s/ Peter C. Economus – 03/31/06*          
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**

23